**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ABDULLRAHMAN ABDO ABO AL GHITH, *et al.*, | ) ) ) ) |
| Petitioners, | ) ) |
| v. | ) Civil Action No. 06-CV-1757 (RJL) |
| GEORGE W. BUSH, *et al.*, | ) ) ) |
| Respondents. | ) ) |

**RESPONDENTS' RESPONSE TO ORDER TO SHOW CAUSE AND
MOTION TO DISMISS PETITION FOR WANT OF JURISDICTION OR,
IN THE ALTERNATIVE, TO TRANSFER PETITION TO THE UNITED STATES
COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Pursuant to the Court's November 24, 2006 Order (dkt. no. 3), respondents hereby submit

the following motion in response to the above-captioned petition, which was purportedly filed on

behalf of an alien detained by the Department of Defense ("DoD") as an enemy combatant at the

United States Naval Base in Guantanamo Bay, Cuba ("Guantanamo"), and seeks to challenge the

validity of the detention.

As an initial matter, respondents have been unable to confirm the identity of petitioner as

a detainee at Guantanamo. By an email dated December 3, 2006, respondents requested

additional identifying information from petitioner's counsel, but have not yet received a

response.

Even if petitioner is ultimately identified as a Guantanamo detainee, and only assuming

for purposes of this motion that he is a Guantanamo detainee, the Court should dismiss the

petition for want of jurisdiction as compelled by the Military Commissions Act of 2006 and the

Detainee Treatment Act of 2005, which amend the *habeas* statute, 28 U.S.C. § 2241, to

(1) withdraw *habeas* and other jurisdiction of the District Courts to consider detention-related claims of aliens held as enemy combatants, and (2) create an exclusive review mechanism in the United States Court of Appeals for the District of Columbia Circuit to address the validity of the detention of such individuals.  In the alternative, pursuant to 28 U.S.C. § 1631, which permits a court to transfer a case to another forum to cure a want of jurisdiction "in the interest of justice," this Court should transfer the above-captioned petition to the Court of Appeals, which is vested with exclusive jurisdiction to review the validity of petitioner's detention.

## BACKGROUND

This case was initiated by the filing of a petition for writ of *habeas corpus* on October 16, 2006.  *See* Pet. (dkt. no. 1).  The petition was filed on behalf of Abdullrahman Abdo Abo Al Ghith, an alien allegedly detained at the United States Naval Base at Guantanamo Bay, Cuba, through the detainee's brother acting as next friend.  *See id*. ¶¶ 13-14.   The petition challenges petitioner's detention as an enemy combatant pursuant to the determination of a Combatant Status Review Tribunal ("CSRT"). [1] *See id*. at p. 1, ¶¶ 10, 20-22.

At the time this case was filed, the Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (10 U.S.C. § 801 note) ("DTA"), enacted on December 30, 2005, had amended the *habeas* statute, 28 U.S.C. § 2241, to provide that "no court, justice, or judge shall have jurisdiction" to consider either (1) a *habeas* petition filed by an alien detained by DoD at Guantanamo, or (2) "any other action against the United States or its agents relating to any aspect of the detention" of such aliens.  *See* DTA § 1005(e)(1).  While the Supreme Court in

---

[1] If petitioner is ultimately identified as a detainee at Guantanamo, he would have either been classified as an "enemy combatant" via a CSRT determination or is awaiting a CSRT determination; there are no detainees classified as "no longer enemy combatants" remaining at Guantanamo.

*Hamdan v. Rumsfeld*, 548 U.S. __, 126 S. Ct. 2749, 2762-69 (2006), held that this particular aspect of the amendment to the *habeas* statute did not apply to *habeas* petitions pending prior to the enactment of the Act, the petition in this case was filed well after enactment of the Act. *See also* DTA § 1005(h)(1) (provision withdrawing court jurisdiction "take[s] effect on the date of enactment" of the DTA). In addition, the DTA created an exclusive review mechanism in the Court of Appeals to address the validity of the detention of such aliens held as enemy combatants: section 1005(e)(2) of the Act stated that the D.C. Circuit "shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and it further specified the scope and intensiveness of that review.[2]

Then, on October 17, 2006, the President signed into law the Military Commissions Act of 2006, Pub. L. No. 109-366 ("MCA"). The MCA, among other things, again amends 28 U.S.C. § 2241 to provide that "no court, justice, or judge shall have jurisdiction" to consider either (1) *habeas* petitions "filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination," or (2) "any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of

---

[2] Section 1005(e)(2)(C) sets forth the scope of the Court of Appeals' review of CSRT determinations. It permits the Court to review "whether the status determination of the Combatant Status Review Tribunal with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence)." DTA § 1005(e)(2)(C)(i). The Court may also review "whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States," "to the extent the Constitution and laws of the United States are applicable." *Id.* § 1005(e)(2)(C)(ii).

an alien who is or was detained by the United States who has been determined by the United

States to have been properly detained as an enemy combatant or is awaiting such determination,"

except as provided in sections 1005(e)(2) and (e)(3) of the DTA.[3]  *See* MCA § 7(a).  Further, the

new amendment to 28 U.S.C. § 2241 took effect on the date of enactment and applies

specifically "*to all cases, without exception, pending on or after the date of the enactment of this*

*Act* which relate to any aspect of the detention, transfer, treatment, trial, or conditions of

detention of an alien detained by the United States since September 11, 2001."  *Id.* § 7(b)

(emphasis added).[4]

On November 24, 2006, the Court ordered respondents to "file with this Court . . . a

statement showing why the Writ of *Habeas Corpus* should not issue."  *See* Nov. 24, 2006 Order

(dkt. no. 3).

## ARGUMENT

**I.    The Military Commissions Act of 2006 and the Detainee Treatment Act of 2005
Divest This Court of Jurisdiction to Hear or Consider the Petition.**

It is well-settled that a district court must dismiss an action where it concludes that it

lacks subject-matter jurisdiction.  "'Without jurisdiction the court cannot proceed at all in any

cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function

---

[3] As noted above, DTA § 1005(e)(2) provides that the Court of Appeals "shall have
exclusive jurisdiction to determine the validity of any final decision of a Combatant Status
Review Tribunal that an alien is properly detained as an enemy combatant."  DTA § 1005(e)(3),
as amended by the MCA, provides that the Court of Appeals "shall have exclusive jurisdiction to
determine the validity of any final decision rendered by a military commission."

[4] The Court of Appeals in certain of the pending Guantanamo detainee appeals,
*Boumediene v. Bush*, No. 05-5062 (D.C. Cir.), and *Al Odah v. United States*, No. 05-5064
(D.C. Cir.), ordered the parties to submit supplemental briefing regarding the significance of the
MCA.  Such briefing was completed on November 20, 2006.

remaining to the Court is that of announcing the fact and dismissing the cause.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869)); *cf.* FED. R. CIV. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

This Court, by the explicit terms of the *habeas* statute, has lacked jurisdiction over this case since the day it was filed. Indeed, when the case was filed, the DTA provided that "no court, justice, or judge" had jurisdiction to consider either a *habeas* petition filed by an alien detained by DoD at Guantanamo or "any other action against the United States or its agents relating to any aspect of the detention" of such an alien. *See* DTA § 1005(e)(1).[5] Moreover, currently, the *habeas* statute has been amended again by the MCA to provide that "no court, justice, or judge shall have jurisdiction" to consider either (1) *habeas* petitions "filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination," or (2) "any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." MCA § 7(a) (amending 28 U.S.C. § 2241). This amendment of 28 U.S.C. § 2241 applies specifically "*to all cases, without exception, pending on or after the date of the enactment of this Act* [October 17,

_____

[5] Petitioner's attempt to relate back the filing of his petition to before the enactment of the DTA based on *John Does Nos. 1-570 v. Bush*, No. 05-CV-313 (CKK), is unavailing. *See* Pet. at ¶ 11 (dkt. no. 1). *John Does* has been dismissed for lack of standing. Oct. 31, 2006 Mem. Op., *John Does*, No. 05-CV-313 (dkt. no. 31) (motion for reconsideration pending).

2006] which relate to any aspect of the detention, transfer, treatment, trial, or conditions of

detention of an alien detained by the United States since September 11, 2001." *Id.* § 7(b)

(emphasis added); *see also* Dec. 13, 2006 Mem. Op. at 4-7, *Hamdan v. Rumsfeld*, No. 04-CV-

1519 (JR) (dkt. no. 86) (holding that the MCA removed statutory habeas jurisdiction in cases

involving an alien detainee held at Guantanamo), attached hereto as Attachment A.  Thus, both

the DTA, when this case was filed, and the MCA, currently, have provided unambiguously that

District Court jurisdiction does not exist over a case like this one.  The only review mechanism

available to a Guantanamo detainee is the exclusive review provided in the Court of Appeals of

the final CSRT decision determining the detainee to be an enemy combatant.  *See supra* note 3 &

accompanying text; DTA § 1005(e)(1), (e)(2).

Indeed, that provision for exclusive review of CSRT decisions in the Court of Appeals

itself operates independently to deprive this Court of jurisdiction, that is, regardless of the

otherwise explicit withdrawal of District Court jurisdiction.  It is well-settled that an

exclusive-review scheme, where applicable, precludes the exercise of jurisdiction under more

general grants of jurisdiction, including *habeas corpus*.  *Cf.*, *e.g.*, 5 U.S.C. § 703 ("form of

proceeding for judicial review is the special statutory review proceeding relevant to the subject

matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable

form of legal action, including actions for . . . writs of . . . habeas corpus"); *Thunder Basin Coal

Co. v. Reich*, 510 U.S. 200, 207-09 (1994) ("exclusive" jurisdiction under federal Mine Act

precludes assertion of district court jurisdiction); *FCC v. ITT World Commc'ns, Inc.*, 466 U.S.

463, 468 (1984) (Hobbs Act) ("The appropriate procedure for obtaining judicial review of the

agency's disposition of these issues was appeal to the Court of Appeals as provided by statute.");

*Laing v. Ashcroft*, 370 F.3d 994, 999-1000 (9th Cir. 2004) ("§ 2241 is ordinarily reserved for

instances in which no other judicial remedy is available"); *Lopez v. Heinauer*, 332 F.3d 507, 511 (8th Cir. 2003) ("Because judicial review was available . . . the district court was not authorized to hear this § 2241 habeas petition."). *See also Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) ("even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute") (footnote omitted); *id.* at 75, 78-79 (request for relief in district court that might affect Court of Appeals' future, exclusive jurisdiction is subject to the exclusive review of the Court of Appeals).

Thus, District Court jurisdiction over this case has never existed. As the Supreme Court has directed, "'[w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the Court is that of announcing the fact and dismissing the cause.'" *Steel Co.*, 523 U.S. at 94 (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) at 514). The petition in this case should not be granted and should be dismissed because the Court lacks jurisdiction over the case.

## II.    Petitioner's Assertions That an Unconstitutional Suspension of the Writ of *Habeas Corpus* Has Been Effected Should Be Rejected.

Petitioner argues that explicit withdrawal of District Court jurisdiction and investment of exclusive review in the Court of Appeals by the DTA (and now the MCA) effects a suspension of the writ of *habeas corpus* inconsistent with the Constitution.[6] *See, e.g.*, Pet. ¶ 12 (dkt. no. 1). Petitioner's argument, however, should be rejected. Petitioner has no constitutional rights,

---

[6] The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST., art. I, § 9, cl. 2.

including under the Suspension Clause, and, in any event, the DTA and MCA provide a constitutionally adequate substitute for *habeas*.

A.    __Petitioner Has No Constitutional Rights Under the Suspension Clause__.

Petitioner's appeal to the Constitution's Suspension Clause is foreclosed by *Johnson v. Eisentrager*, 339 U.S. 763 (1950); *see also Khalid v. Bush*, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005) (Leon, J.) (holding that a detainee who is a non-resident alien captured and detained at Guantanamo has no constitutional right to habeas relief ); Dec. 13, 2006 Mem. Op. at 15-21, *Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR) (dkt. no. 86) (same).  In *Eisentrager*, a group of German nationals, who were captured in China by U.S. forces during World War II and imprisoned in a U.S. military base in Germany, sought *habeas* relief in federal court.  Although the military base in Germany was controlled by the U.S. Army, *id.* at 766, the Supreme Court held that these prisoners had no constitutional right to *habeas* relief in federal court.  This was so because the prisoners "at no relevant time were within any territory over which the United States is *sovereign*." *Id.* at 777-78 (emphasis added).  The Court further held the Fifth Amendment inapplicable to these aliens because, in reasoning fully applicable to the Suspension Clause, there is no textual or historical support for "[s]uch extraterritorial application of organic law." *Id.* at 782-85; *see also id.* at 768.  As the Court noted, such application "would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment.  Not one word can be cited.  No decision of this Court supports such a view.  None of the learned commentators on our Constitution has ever hinted at it.  The practice of every modern government is opposed to it." *Id.* at 784-85 (citation omitted).

As the Supreme Court later explained, *Eisentrager*'s rejection of constitutional claims by alien prisoners in U.S. custody at a military base abroad was emphatic because aliens have no constitutional rights outside the United States' sovereign territory.  *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 269-74 (1990); *cf. United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) ("Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens.").   In *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), the Court similarly confirmed the "well established" principle that "certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."  Following these precedents, Judge Robertson recently held that an alien detainee held at Guantanamo may not "claim entitlement to a <u>constitutionally</u> guaranteed writ [of habeas corpus]" because Guantanamo lies outside "the sovereign realm." Dec. 13, 2006 Mem. Op. at 21, *Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR) (dkt. no. 86).

Furthermore, even when an alien is found within United States sovereign territory, an alien's lack of *voluntary* connection to the Nation denies him protections under the Constitution. As the Supreme Court explained in *Eisentrager*, the alien has been accorded "an ascending scale of rights as he increases his identity with our society," 339 U.S. at 770, and the privilege of litigation has been extended to aliens "only because permitting their presence in the country implied protection," *id.* at 777-78.   Thus, an alien seeking constitutional protections must establish not only that he has come within the territory over which the United States has sovereignty, but also that he had developed substantial voluntary connections with this country. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271-72 (1990); *accord Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (a "'foreign entity without property or presence in this country has no

- 9 -

constitutional rights, under the due process clause or otherwise'") (quoting *People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999)).  In *Verdugo-Urquidez*, the Supreme Court held that a non-resident alien who had no previous significant voluntary connection with the United States, and was involuntarily transported to the United States and held against his will, had no Fourth Amendment right with respect to the search of his property abroad by U.S. agents.  494 U.S. at 271.  The Court reasoned that presence in the United States that is "lawful but involuntary [] is not of the sort to indicate any substantial connection with our country."  *Id*.; *see also* Dec. 13, 2006 Mem. Op. at 21, *Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR) (dkt. no. 86).

In light of these principles, petitioner cannot claim any constitutional protections, including under the Suspension Clause, in this case.  *See, e.g.*, Dec. 13, 2006 Mem. Op. at 21 n.15, *Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR) (dkt. no. 86) ("the Suspension Clause does not guarantee the right to petition for habeas corpus to non-resident enemy aliens captured and detained outside the United States.").  Petitioner is an alien who does not allege any connection, much less a voluntary one, to the United States at all.  *See, e.g.*, *id.* at 21 (holding that there was "no dispute . . . that [the Guantanamo detainee's] presence within the exclusive jurisdiction of the United States has been involuntary.").  Furthermore, he is allegedly detained at Guantanamo, and it is clear that Guantanamo is outside the sovereign territory of the United States.  *See, e.g.*, *id.* at 21 (holding that Guantanamo "lies outside the sovereign realm").  As the Supreme Court observed in *Rasul*, under the 1903 Lease Agreement executed between the United States and Cuba, "'the United States recognizes the continuance of the *ultimate sovereignty of the Republic of Cuba* over the [leased areas],' while 'the Republic of Cuba consents that . . . the United States

shall exercise complete jurisdiction and control over and within said areas.'"[7] *Rasul v. Bush*, 542 U.S. 466, 124 S. Ct. 2686, 2690-91(2004) (emphasis added). Indeed, even as the Court in *Rasul* framed the question before it for review, it fully recognized a distinction between "'ultimate sovereignty'" and "plenary and exclusive jurisdiction" at Guantanamo.[8] *Id*. at 2693 ("The question now before us is whether the habeas statute confers a right to judicial review of the legality of Executive detention of aliens in a territory over which the United States exercises 'plenary and exclusive jurisdiction,' but not 'ultimate sovereignty.'"). *Cf. United States v. Spelar*, 338 U.S. 217, 221-22 (1949) (lease for military air base in Newfoundland "effected no transfer of sovereignty with respect to the military bases concerned"); *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380-81 (1948) (U.S. naval base in Bermuda, controlled by United States under lease with Great Britain, was outside United States sovereignty).

---

[7] Indeed, the 1903 Lease prohibits the United States from establishing certain "commercial" or "industrial" enterprises over Guantanamo, a restriction wholly inconsistent with control congruent with sovereignty. *See* Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.–Cuba, art. II-III, T.S. No. 418 (6 Bevans 1113).

[8] *Rasul* does not otherwise impact the analysis on the constitutional question because that case addressed only the reach of the federal habeas *statute*. *See* 124 S. Ct. at 2701 (Scalia, J., dissenting) ("The petitioners do not argue that the Constitution independently requires jurisdiction here."). Far from overruling settled law under *Eisentrager* and its progeny against the Constitution's extraterritorial application to aliens, *Rasul* expressly distinguished between the statutory and constitutional holdings of *Eisentrager* and limited its analysis to the former, *i.e.*, the proper interpretation of 28 U.S.C. § 2241 as it existed at the time. *See* 124 S. Ct. at 2694-95. Specifically, it found that Cuba's express consent to the United States' "complete jurisdiction and control over and within [the Guantanamo Bay Naval Base]" brought the base within the meaning of the *habeas* statute's distinctive phrase "within their respective jurisdictions." *Id*. at 2694-95; *see* 28 U.S.C. § 2241(a). Given the additional fact that "the *statute* dr[e]w[] no distinction between Americans and aliens held in federal custody," the Court held that "[a]liens held at the base, no less than American citizens, [were] entitled to invoke the federal courts' authority *under § 2241*." 124 S. Ct. at 2696 (emphasis added).

Accordingly, given the absence of U.S. sovereignty over Guantanamo and petitioner's status as an alien without voluntary connection to this country, petitioner lacks cognizable constitutional rights, including under the Suspension Clause.[9]

**B.    The Detainee Treatment Act Provides a Constitutionally Adequate Substitute for *Habeas* That Does Not Offend the Suspension Clause in Any Event.**

Even if petitioner could properly invoke the Suspension Clause, the review provided in the Court of Appeals of the "enemy combatant" determination, does not effect an unconstitutional suspension of the writ. The Supreme Court has stressed that the "'the power to award the writ by any of the Courts of the United States, must be given by written law.'" *See*

---

[9] The decision of Judge Green in *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 461-64 (D.D.C. 2005), extending Fifth Amendment due process rights to Guantanamo detainees should not be followed. *See Khalid v. Bush*, 355 F. Supp. 2d 311, 320-21 (D.D.C. 2005) (Leon, J.) (aliens detained at Guantanamo are not possessed of constitutional rights); Dec. 13, 2006 Mem. Op. at 15-21, *Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR) (dkt. no. 86) (the Suspension Clause does not apply to aliens detained at Guantanamo). Judge Green's rationale places undue, virtually dispositive weight upon a single, oblique footnote in *Rasul* that "[p]etitioners' allegations . . . unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.'" 124 S. Ct. at 2698 n.15. That footnote, however, appended to a paragraph focused entirely on the question of statutory jurisdiction under 28 U.S.C. § 2241 and to a sentence asserting what "[p]etitioners contend[ed]" for such statutory jurisdictional purposes, cannot fairly be read as *sub silentio* overruling *Eisentrager* and the other repeated holdings of the Supreme Court that aliens outside sovereign United States territory and with insufficient connection to the United States lack constitutional rights. *See Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001) (the Supreme Court "does not . . . hide elephants in mouseholes"). The reliance in *In re Guantanamo Detainee Cases* upon the *Insular Cases* and *Ralpho v. Bell*, 569 F.2d 607 (D.C. Cir. 1977), as extending fundamental constitutional rights to areas where the United States "technically" is not considered sovereign, *see* 355 F. Supp. 2d at 461, is likewise misplaced. The territories at issue in those cases were governed essentially as sovereign areas, that is, by Congress pursuant to its constitutional power to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," U.S. CONST. art. IV, § 3, cl.2, and, thus, are distinct from Guantanamo where the United States does not exercise sovereignty. *See Balzac v. People of Porto Rico*, 258 U.S. 298, 312-13 (1922); *Dorr v. United States*, 195 U.S. 138, 142-43, 149 (1904); *Ralpho*, 569 F.2d at 618-19.

*Felker v. Turpin*, 518 U.S. 651, 664 (1996)  (quoting *Ex Parte Bollman*, 8 U.S. (4 Cranch.) 75, 94 (1807)).  *See also* 518 U.S. at 664 ("judgments about the proper scope of the writ [of *habeas corpus*] are 'normally for Congress to make'") (quoting *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)).  Consistent with these principles, the Supreme Court has held that Congress may freely repeal *habeas* jurisdiction, if an adequate and effective substitute remedy is provided.  *See Swain v. Pressley*, 430 U.S. 372, 381 (1977) (non-Article III court review of detention can form adequate substitute for *habeas* and avoid suspension issue).

As an initial matter, petitioner cannot argue that the Constitution provides a freestanding jurisdictional basis for habeas relief in *district court* independent of the jurisdiction Congress provides by statute.   Under the Constitution the federal district courts exist as a creation of Congress.  *See* U.S. CONST. art. III, § 1 ("The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.").  Logically then, because the Constitution contains no provision requiring the existence of district courts, there is no extra-statutory authority, under the Constitution or otherwise, that would automatically vest district courts with *habeas* or other jurisdiction.  *See*, *e.g.*, *Sheldon v. Sill*, 49 U.S. (8 How.) 441 (1850) ("Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies."); *Kokkonen v. Guardian Life Ins. Co of America*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.") (citation omitted).  By prescribing the review available to aliens detained as enemy combatants, Congress has exercised its broad authority to define District Court jurisdiction.

In any event, the review provided in the Court of Appeals under the MCA and DTA is more than constitutionally sufficient. Section 1005(e)(2)(C) of the DTA preserves an alien's ability to challenge his CSRT determination. Specifically, the DTA permits consideration by the Court of Appeals of whether the CSRT determination "was consistent with the standards and procedures" governing the CSRT process, "including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence." DTA § 1005(e)(2)(C)(i). Further, the Court of Appeals can assess "whether the use of such standards and procedures to make the [enemy combatant] determination is consistent with the Constitution and laws of the United States." *Id.* § 1005(e)(2)(C)(ii). Similarly, final decisions of a military commission are reviewable both as to their consistency with standards and procedures specified for a military commission and with the Constitution and laws of the United States to the extent they are applicable. DTA § 1005(e)(3)(D).

The availability of such review negates any argument under the Suspension Clause. First, the MCA and DTA provide alien detainees with greater rights than that traditionally available in the military tribunal context. The Supreme Court has held that the habeas review traditionally afforded in the context of military tribunals does not examine the guilt or innocence of the defendant, nor does it examine the sufficiency of the evidence. Rather, it is limited to the question of whether the military tribunal had jurisdiction over the charged offender and offense. *See Yamashita v. Styer*, 327 U.S. 1, 8 (1946) ("If the military tribunals have lawful authority to hear, decide and condemn, their action is not subject to judicial review merely because they have made a wrong decision on disputed facts. Correction of their errors of decision is not for the courts but for the military authorities which are alone authorized to review their decision"); *id.* at 17 ("We do not here appraise the evidence on which petitioner was convicted" because such a

- 14 -

question is "within the peculiar competence of the military officers composing the commission and were for it to decide"); *Ex parte Quirin*, 317 U.S. 1, 25 (1942) ("We are not here concerned with any question of the guilt or innocence of petitioners"). *See also Eisentrager*, 339 U.S. at 786. By providing for constitutional and other legal claims, including issues of compliance with the military's own procedures and evidentiary sufficiency, the DTA and MCA actually provide petitioner with greater rights of judicial review than that traditionally afforded to those convicted of war crimes by a military commission.

Second, traditional *habeas* review in alien-specific contexts involved, in general, review of questions of law, but "other than the question whether there was some evidence to support the order, the courts generally did not review the factual determinations made by the Executive." *INS v. St. Cyr*, 533 U.S. 289, 306 (2001) (noting with respect to deportation orders under historical immigration laws that "the sole means by which an alien could test the legality of his or her deportation order was by bringing a habeas corpus action in district court. In such cases, other than the question whether there was some evidence to support the order, the courts generally did not review factual determinations made by the Executive."). Similarly, under the DTA, to the extent an alien-petitioner has concerns about the legal adequacy of the CSRT standards and procedures used to make an "enemy combatant" determination, he may squarely raise those claims and have them adjudicated in the Court of Appeals. *See* DTA § 1005(e)(2)(C). Further, the Court of Appeals' review involves an assessment by that Court of whether the CSRT, in reaching its decision, complied with "the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence." *See id*. § 1005(e)(2)(C)(i).

Furthermore, it cannot be that to be constitutionally adequate, a substitute for *habeas* must entitle a petitioner to full *de novo* review by a court. Any such assertion would not only be

- 15 -

inconsistent with traditional *habeas* practice, *see supra*,[10] it could not be reconciled with *Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S. Ct. 2633 (2004), in which the controlling opinion made clear that constitutional requirements for detaining even citizens in this country as enemy combatants "could be met by an appropriately authorized and properly constituted military tribunal" modeled upon military procedures implementing the Geneva Conventions for determining the status of detainees potentially entitled to prisoner-of-war status.[11] *See id.* at 2651 (plurality opinion). Acknowledging "the weighty and sensitive governmental interests in ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States," *id.* at 2647, as well as the need to "tailor[] [enemy combatant proceedings] to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict," *id.* at 2649, the Plurality noted that proceedings by which the military determined enemy combatant status legitimately could be severely limited in scope, in ways that are not characteristic of traditional judicial proceedings, including permitting hearsay from the Government, establishing a presumption in favor of the Government, and limiting factual disputes to the alleged combatant's acts. *Id.* Such an approach, now affirmed by Congress through its approval of the CSRT process used for enemy combatant status determinations, *see* DTA § 1005(e)(2), simply cannot be reconciled with an argument that wide-ranging, *de novo*

---

[10] *See also* Note, Developments in the Law – Federal Habeas Corpus, 83 HARV. L. REV. 1038, 1113-1114 (1970) ("From 1789 to 1867, the period during which, with minor exceptions, federal habeas corpus extended only to federal prisoners, the federal habeas court did not hold fact hearings. The facts asserted in the return to the writ had to be accepted despite the prisoner's attempt to controvert them.").

[11] The CSRT process is modeled upon that same process, although significant additional procedural process and protections are provided.

court review of the outcome of those proceedings is necessary to avoid Suspension Clause concerns.

For these reasons, the exclusive-review scheme afforded by the DTA is more than adequate for Suspension Clause purposes, even if petitioner could avail himself of the Constitution, which he cannot.

**III.    In the Alternative, if Petitioner is Identified as a Guantanamo Detainee, the Court Should Transfer this Petition to the United States Court of Appeals for the D.C. Circuit, Which is Vested With Exclusive Jurisdiction to Hear and Consider Actions Seeking Review of the Validity of the Detention of Individuals Detained at Guantanamo Bay.**

As an alternative to dismissal of this action for want of jurisdiction, pursuant to 28 U.S.C. § 1631, this court "shall, if it is in the interest of justice, transfer" this case to a court of competent jurisdiction.[12]  *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818

---

[12]  28 U.S.C. § 1631 provides:

> Whenever a civil action is filed in a court as defined in section 610 of this title or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

28 U.S.C. § 1631.  Although the statute is applicable to "civil action[s]," and this case was docketed as a petition for writ of *habeas corpus*, the petition is properly construed as seeking review of the validity of the CSRT's determination that petitioner is properly detained as an enemy combatant.  Thus, this action should be considered a "petition for review of administrative action" that is subject to transfer pursuant to 28 U.S.C. § 1631.  *Cf. Berrum-Garcia v. Comfort*, 390 F.3d 1158, 1162-63 (10th Cir. 2004) (transferring petition for writ of habeas corpus filed in district court by alien challenging INS removal order to court of appeals pursuant to 28 U.S.C. § 1631 because Congress provided for direct judicial review of such orders in the courts of appeals).

(1988) (Section 1631 "confers on [a federal court] authority to make a single decision upon

concluding that it lacks jurisdiction — whether to dismiss the case or, 'in the interest of justice,'

to transfer it to a court . . . that has jurisdiction.") (quoting 28 U.S.C. § 1631); *Tootle v. Sec'y of*

*the Navy*, 446 F.3d 167, 173 (D.C. Cir. 2006) ("[U]nder § 1631, a district court must dismiss *or*

transfer upon concluding that it lacks jurisdiction.") (emphasis in original).

As explained *supra*, the MCA and DTA have withdrawn this Court's jurisdiction to hear

the petition in this case. The petition should have been filed in the United States Court of

Appeals for the D.C. Circuit, which is vested with exclusive jurisdiction to consider such

challenges. It would be in the interest of justice for this Court to transfer the petition to the

Court of Appeals for review, assuming petitioner can be identified as a Guantanamo detainee.[13]

*See American Beef Packers, Inc. v. I.C.C.*, 711 F.2d 388, 390 (D.C. Cir. 1983) (per curiam)

(recognizing that "Congress contemplated that [28 U.S.C. § 1631] would aid litigants who were

confused about the proper forum for review"). Thus, given that this Court lacks subject-matter

jurisdiction over this action, in the alternative to dismissal of the petition and if petitioner can be

identified as a Guantanamo detainee, the Court should transfer the petition pursuant to

---

[13] In the meantime, no further proceedings should take place in this case, including with
respect to entry of a protective order or counsel access regime or the ordering of a factual return,
as such matters clearly fall within the Court of Appeals' exercise of exclusive jurisdiction and
outside this Court's jurisdiction, which has been unequivocally withdrawn by statute and cannot
be ignored. *See supra* § I; *Felker v. Turpin*, 518 U.S. 651, 664 (1996) ("judgments about the
proper scope of the writ [of *habeas corpus*] are 'normally for Congress to make'") (quoting
*Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)); *Telecomm. Research & Action Ctr.*, 750 F.2d at
75, 78-79 (request for relief in district court that might affect Court of Appeals' future, exclusive
jurisdiction is subject to the exclusive review of the Court of Appeals). *See also Kokkonen*, 511
U.S. at 377 ("Federal courts are courts of limited jurisdiction. They possess only that power
authorized by Constitution and statute, which is not to be expanded by judicial decree."); *supra*
at 13-14.

28 U.S.C. § 1631 to the Court of Appeals for review under section 1005(e)(2) of the DTA, as amended.

## CONCLUSION

For these reasons, the Court should dismiss the above-captioned petition for lack of subject-matter jurisdiction.  In the alternative, the Court should transfer the petition to the United States Court of Appeals for the D.C. Circuit for review of the validity of the petitioner's detention at Guantanamo as provided by the Detainee Treatment Act of 2005, as amended.

Dated: December 19, 2006                    Respectfully submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General

                                            DOUGLAS N. LETTER
                                            Terrorism Litigation Counsel

                                            _____/s/ Nicholas A. Oldham_____
                                            JOSEPH H. HUNT (D.C. Bar No. 431134)
                                            VINCENT M. GARVEY (D.C. Bar No. 127191)
                                            TERRY M. HENRY
                                            JAMES J. SCHWARTZ
                                            ROBERT J. KATERBERG
                                            NICHOLAS J. PATTERSON
                                            ANDREW I. WARDEN
                                            EDWARD H. WHITE
                                            NICHOLAS A. OLDHAM
                                            Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Ave., N.W.
                                            Washington, DC  20530
                                            Tel:  (202) 514-4107

                                            Attorneys for Respondents

**EXHIBIT A**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SALIM AHMED HAMDAN,          :
                              :
       Plaintiff,         :
                              :
   v.                    :  Civil Action No. 04-1519 (JR)
                              :
DONALD H. RUMSFELD,        :
                              :
       Defendant.        :

## MEMORANDUM

The government seeks dismissal of the petition of Salim Ahmed Hamdan for a writ of habeas corpus for lack of subject matter jurisdiction, relying upon the jurisdiction-stripping provisions of the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (MCA) [75]. Petitioner resists, arguing that the MCA did not remove our jurisdiction over pending Guantanamo habeas petitions, and alternatively that, if it did, it was an unconstitutional suspension of the writ of habeas corpus [78].

### Background

Salim Ahmed Hamdan, a Yemeni national, was taken into United States military custody in Afghanistan in November 2001. He was transported to the Defense Department's detention facility at Guantanamo Bay in June 2002. In July 2003, the President declared him eligible for trial by military commission. On April 6, 2004, Hamdan petitioned for mandamus or habeas corpus in

the United States District Court for the Western District of
Washington.  On July 13, 2004, after having been held for about
two years and eight months without formal charges, Hamdan was
finally charged at Guantanamo Bay with a single count of
conspiracy.  In August 2004, his habeas petition was transferred
to this court.

On November 8, 2004, I granted Hamdan's petition for a
writ of habeas corpus after finding that he could not be tried
lawfully before a military commission that had not been approved
by Congress, Hamdan v. Rumsfeld, 344 F. Supp. 2d 152 (D.D.C.
2004).  That decision was reversed by a panel of the D.C. Circuit
on July 15, 2005, 415 F.3d 33, in a decision that was itself
reversed a year later by the Supreme Court, Hamdan v. Rumsfeld,
126 S. Ct. 2749 (2006), four justices noting that "[n]othing
prevents the President from returning to Congress to seek the
authority he believes necessary" to lawfully try enemy
combatants, Id. at 2799, (Breyer, J., concurring).[1]  On
September 22, 2006, the Court of Appeals remanded the case to me
"for further proceedings."  The remand order contained no
instructions, nor was it clear what proceedings, if any, would be
possible – for, by that time, the President had indeed
"return[ed] to Congress," and he had asked Congress to strip the

_____

[1]Four justices also concluded that conspiracy is not an
offense that may be tried by a military commission.  Id. at 2779.

- 2 -

federal courts of their jurisdiction to hear any habeas petitions
of the Guantanamo detainees.

On September 29, 2006 Congress enacted, and on
October 17, 2006, the President signed, the Military Commissions
Act.  The day after the MCA became law, the government filed, in
each of the 181 Guantanamo habeas cases pending in this Court, a
Notice of Military Commissions Act of 2006 [75], highlighting the
jurisdiction-stripping and retroactivity provisions of the Act.
The government focused on section 7 of the Act, which amends the
federal habeas statute by removing the jurisdiction of any
"court, judge, or justice" over habeas petitions and all other
actions filed by aliens who are either detained as enemy
combatants or are "awaiting such determination."  MCA § 7(a).  I
construed that notice as a motion to dismiss for lack of subject
matter jurisdiction and called for a response from Hamdan [77].[2]

---

[2]I did not issue similar orders in the 14 other Guantanamo
habeas cases on my own docket, in deference to the continuing
pendency before the Court of Appeals of two cases in which that
court has asked for supplemental briefing on the effect of the
Military Commissions Act, Boumediene, et al. v. Bush, 450 F.
Supp. 2d 25 (D.D.C. 2006) (appeal pending); Al Odah, et al. v.
United States, 346 F. Supp. 2d 1 (D.D.C. 2004) (appeal pending).
Hamdan's successful certiorari petition in the Supreme Court,
however, sets his case apart from the others.  Unlike the
petitioners in those other cases, moreover, Hamdan moved for a
briefing schedule on the subject of jurisdiction [73] even before
the government filed its notice.

**Analysis**

The Military Commissions Act and the briefs of the parties present three questions:  (1) As a matter of statutory interpretation and construction, did Congress actually succeed in removing our statutory habeas jurisdiction over the detainee habeas cases?  (2) If so, is the Military Commissions Act a constitutionally valid "suspension" of the writ of habeas corpus within the meaning of the Suspension Clause, U.S. Const. art. I § 9 cl. 2?  (3) If not, and if a "constitutional" writ of habeas corpus survives the Military Commissions Act, does Hamdan have a right to seek such a writ?  The answers to these questions are "yes" to number (1) and "no" to numbers (2) and (3).

**1. The MCA reflects clear congressional intent to limit the statutory habeas jurisdiction of the federal courts.**

It has been clear since Ex Parte Yerger, 75 U.S. 85 (1869) (habeas petition by a prisoner facing trial by military commission), that statutory language will be interpreted as stripping courts of their habeas jurisdiction only when the intent of Congress is abundantly clear.  "Implications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction; instead, Congress must articulate specific and unambiguous statutory directives to effect a repeal."  INS v. St. Cyr, 533 U.S. 289, 299 (2001).  In the instant case, it appears to be conceded that Congress's intent to remove jurisdiction over future habeas petitions filed by a

- 4 -

specified class of individuals was clear enough.  Hamdan's

submission, however, is that the MCA lacks the requisite clarity

to support its retroactive operation – stripping the courts of

their jurisdiction over previously filed habeas cases.

Section 7 of the MCA provides:

(a) IN GENERAL. – Section 2241 of title 28, United
States Code [the habeas statute], is amended by
... inserting the following new subsection (e):

(e)(1) No court, justice, or judge shall have
jurisdiction to hear or consider an application
for a writ of habeas corpus filed by or on behalf
of an alien detained by the United States who has
been determined by the United States to have been
properly detained as an enemy combatant or
is awaiting such determination.

(2) Except as provided in paragraphs (2) and (3)
of section 1005(e) of the Detainee Treatment Act
of 2005 (10 U.S.C. 801 note), no court, justice,
or judge shall have jurisdiction to hear or
consider any other action against the United
States or its agents relating to any aspect of the
detention, transfer, treatment, trial, or
conditions of confinement of an alien who is or
was detained by the United States and has been
determined by the United States to have been
properly detained as an enemy combatant or is
awaiting such determination.

(b) EFFECTIVE DATE. – The amendment made by
subsection (a) shall take effect on the date of
the enactment of this Act, and shall apply to all
cases, without exception, pending on or after the
date of the enactment of this Act which relate to
any aspect of the detention, transfer, treatment,
trial, or conditions of detention of an alien
detained by the United States since September 11,
2001.

Relying on what he calls "[o]rdinary principles of statutory

construction," [78 at 10] and quoting Hamdan, 126 S. Ct. at 2765-

- 5 -

69, Hamdan argues that the retroactivity provision of § 7(b) does
not clearly apply to the habeas jurisdiction-stripping provision
of § 7(a), because, while the language of § 7(b) tracks much of
the language in § 7(a) describing cases <u>other</u> than habeas
petitions, it does not explicitly refer to habeas petitions.  The
argument is unsuccessful.

Section 7(b) instructs that "the <u>amendment</u> made by
subsection (a)" is effective immediately, and that it applies
both retroactively and prospectively.  New subsections (e)(1) and
(e)(2) both amend the habeas statute and therefore together
comprise "the amendment made by subsection (a)."  Section 7(b),
then, means that all of § 7(a), and not just the part encompassed
in new subsection (e)(2), applies retroactively.

Application of the retroactivity clause in § 7(b) to
new subsection (e)(1) is also compelled by the framework of the
statute.  The references in section 7 are to one large category
of cases: those cases that relate to any aspect of the detention,
transfer, treatment, trial, or conditions of detention of certain
aliens.  In § 7(a), Congress divided this broad category into two
subcategories – (1) habeas petitions and (2) "any <u>other</u> action[s]
against the United States ... relating to any aspect of the
detention..." – and removed jurisdiction over both types of
cases.  "Other," as used in this subsection, logically describes
cases other than the habeas petitions referenced in the previous

- 6 -

subsection and confirms the inclusion of habeas proceedings within the broader category encompassing "all cases . . . pending on or after the date of enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001." Section 7(b) applies "without exception" to the broad category of cases encompassing both sub-categories addressed in new subsections (e)(1) and (e)(2); this language is "so clear that it could sustain only one interpretation." Lindh v. Murphy, 521 U.S. 320, 329 n.4 (1997). Habeas petitions are thus clearly within the ambit of § 7(b).

## 2. The MCA is not a constitutionally valid suspension of the writ of habeas corpus.

Congress unquestionably has the power to establish and to define the jurisdiction of the lower federal courts. U.S. Const. art. III, §§ 1, 2. But it does not necessarily follow, from the fact that Congress has repealed its statutory grant of habeas jurisdiction, that Congress has also "suspended" the writ. Some historical background will be helpful in explaining why this is so.

The history of habeas corpus – the "symbol and guardian of individual liberty," Peyton v. Rowe, 391 U.S. 54, 59 (1968) – is well established. What we now know as the "Great Writ"

originated as the "prerogative writ of the Crown";[3] its purpose
at first was to bring people into court rather than out of
imprisonment.  Alan Clarke, Habeas Corpus: The Historical Debate,
14 N.Y.L. Sch. J. Hum. Rts. 375, 378 (1998), citing S.A. DeSmith,
The Prerogative Writs, 11 Cambridge L.J. 40 (1951); William F.
Duker, A Constitutional History of Habeas Corpus 17 (1980).  By
the year 1230, the writ's utility for that purpose was a well-
known aspect of English common law.  Clarke, supra.

     The transformation of the writ to a guardian of liberty
dates to the 14th century, when the Norman Conquest overlaid a
centralized court system on top of the existing courts.  It was
during this period that prisoners began to initiate habeas
proceedings to challenge the legality of their detention.  Id.
The first such use was by detained members of the privileged
classes who raised habeas claims in superior central courts to
challenge their convictions in inferior courts; central courts
would grant such writs to assert the primacy of their
jurisdiction.  Id.  Thus, oddly enough, the original use of the
writ by prisoners challenging convictions or detentions had more
to do with jurisdictional disputes between courts than concerns
over liberty.  Id.; Gerald L. Neuman, Habeas Corpus, Executive

---

[3]Standing alone, the phrase "habeas corpus" refers to the
common law writ of habeas corpus ad subjiciendum, or the "Great
Writ."  Preiser v. Rodriquez, 411 U.S. 475, 484-85 and n.2 (1973)
citing Ex parte Bollman, 8 U.S. (4 Cranch) 75, 95 (1807).

Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 970-71 (1998).

As the power of the common law courts expanded in the 15th century, so too did the availability and meaning of habeas corpus. The writ became a favorite tool of both Parliament and the judiciary in battling the monarch's assertion of unbridled power. Clarke, supra at 380. By 1670, habeas corpus was "the most usual remedy by which a man is restored again to his liberty, if he have been against law deprived of it." Bushell's Case, Vaughan 135, 136, 124 Eng. Rep. 1006, 1007. The growing significance of the writ is reflected in the Habeas Corpus Act of 1679, described by Blackstone as "a second magna charta, a stable bulwark of our liberties." 1 Blackstone 133.

Notwithstanding the cherished status of habeas corpus, its suspension in England was not uncommon. The writ was suspended in 1688 and 1696 because of conspiracies against the king, again during the American revolution, and at other points during the 18th century. Rex A. Collings, Jr., Habeas Corpus for Convicts – Constitutional Right or Legislative Grace?, 40 Cal. L. Rev. 335, 339 (1952).

Colonists in America were well aware of the growing significance of the Great Writ, and many asserted a common law right to habeas corpus in the period leading up to the adoption of the Constitution. Massachusetts, New Hampshire, and Georgia

adopted constitutional provisions guaranteeing the writ or
prohibiting its suspension under most circumstances.  Max Rosenn,
The Great Writ -- A Reflection of Societal Change, 44 Ohio St.
L.J. 337, 338 n.14 (1983).  Several delegates to the
Constitutional Convention sought to include a guarantee of habeas
corpus in the federal Constitution, Erwin Chemerinsky, Thinking
about Habeas Corpus, 37 Case W. Res. L. Rev. 748, 752, and the
language that emerged from the Constitutional Convention,
forbidding the suspension of habeas unless necessary in the face
of "rebellion or invasion," U.S. Const. art. I, § 9, cl. 2, was a
compromise.  Habeas corpus nevertheless enjoys powerful and
unique constitutional stature as the only common law writ
explicitly referenced in the Constitution.  The first session of
Congress also evinced appreciation for the writ: in section 14 of
the Judiciary Act of 1789, Congress affirmatively gave the power
to issue writs of habeas corpus to the newly created federal
courts.  Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat 73, 81.  It
is that statute, amended several times over the last 217 years,
that the MCA has amended once again: this time to take away
jurisdiction.[4]

---

[4]The MCA may not have been Congress's last word on the
statutory habeas rights of detainees such as Hamdan.  On December
5, 2006, Senators Specter and Leahy introduced the Habeas Corpus
Restoration Act of 2006, S. 4081, 109th Cong. (2006), which would
grant statutory habeas rights to those whose rights were repealed
by the MCA.

Article I, section 9, clause 2 of the Constitution
provides, "The Privilege of the Writ of *Habeas Corpus* shall not
be suspended, unless when in Cases of Rebellion or Invasion the
public Safety may require it."  "Although [the Suspension Clause]
does not state that suspension must be effected by, or authorized
by, a legislative act, it has been so understood, consistent with
English practice and the Clause's placement in Article I."  Hamdi
v. Rumsfeld, 542 U.S. 507, 562 (2004) (Scalia, J., dissenting),
citing Ex parte Bollman, 8 U.S. at 101; Ex parte Merryman, 17 F.
Cas. 144, 151—152 (CD Md. 1861) (Taney, C. J., rejecting
Lincoln's unauthorized suspension); 3 Story § 1336, at 208—209.[5]

Congress has authorized executive suspension of the
writ only four times.  See Duker, supra at 149, 178 n.190.  All
such suspensions were accompanied by clear statements expressing
congressional intent to suspend the writ and limiting the
suspension to periods during which the predicate conditions
(rebellion or invasion) existed.  Id.  The first such instance
was during the Civil War, when the status and availability of
habeas corpus were at the center of an epic struggle.  In 1861,
without congressional authorization, President Lincoln gave the
Commanding General of the Army permission to suspend the writ in

---

[5]In his dissent in Hamdi, Justice Scalia also makes
reference to President Jefferson's unsuccessful attempt to
suspend the writ in response to the Aaron Burr conspiracy.
Hamdi, 542 U.S. at 563 (Scalia, J. dissenting), citing 16 Annals
of Congress 402-425 (1807).

response to rioting between Philadelphia and Washington as Union
troops moved down the coast.  A. Lincoln, Letter to Commanding
General Winfield Scott, (April 27, 1861), reprinted in <u>Abraham
Lincoln: Speeches and Writings, 1859-1865</u>, at 237 (D.
Fehrenbacher ed. 1989).  John Merryman was subsequently arrested
for interfering with troop movements and challenged the executive
suspension of the writ.  Chief Justice Taney, riding circuit,
heard the case and ruled in Merryman's favor, holding that only
Congress may suspend the writ.  <u>Ex parte Merryman</u>, 17 F. Cas. at
151—152.  Lincoln ignored Taney's order, but Congress eventually
authorized executive suspension, mooting the question of whether
or not Lincoln's initial suspension was unconstitutional and
avoiding a Supreme Court test.  Act of Mar. 3, 1863, 12 Stat.
755.  Thereafter, Lincoln's suspensions explicitly relied upon
the congressional grant of authority.  <u>See, e.g.</u>, Proclamation
No. 7, 13 Stat. 734 (1863).

     After the Civil War, Congress next authorized executive
suspension of the writ in its Ku Klux Klan Act, which allowed
President Grant to suspend the writ while rebellions were raging
in several South Carolina counties.  Duker, <u>supra</u> at 178 n.190.
Congress's last two authorizations for executive suspension of
the writ were in 1902, when it granted suspension power to the
President and the governor during a rebellion in the

Phillipines,[6] and in 1941, after the attack on Pearl Harbor, when Congress authorized the governor of Hawaii to temporarily suspend the writ in that territory.[7]  All four congressionally authorized executive suspensions occurred during times of indisputable, and congressionally declared, rebellion or invasion.

The Supreme Court has never decided whether an Act of Congress alone has effectively "suspended" the writ.  In two relatively recent cases involving the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), indeed, the Court has carefully avoided saying exactly what the Suspension Clause protects.  In Felker v. Turpin, 518 U.S. 651 (1996), the Court, per Rehnquist, C.J., "assume[d], for purposes of decision here, that the Suspension Clause of the Constitution refers to the writ as it exists today, rather than as it existed in 1789," but held that the restrictions placed by the AEDPA upon second and successive statutory habeas petitions by prisoners were "well within the compass of [the writ's] evolutionary process, and . . . do not amount to a 'suspension' of the writ contrary to Article I, § 9." 518 U.S. at 663-64.  In INS v. St. Cyr, 533 U.S. 299 (2001), the Court rejected the government's argument that the AEDPA and the IIRIRA had effectively stripped

---

[6]Act of July 1, 1902, ch. 1369, 32 Stat. 691.

[7]See Duncan v. Kahanamoku, 327 U.S. 304, 307-308 (1946).

- 13 -

the federal courts of jurisdiction to decide questions of law.
Acknowledging that the scope of the writ has expanded
significantly since the Founding, the Court noted that, "at the
absolute minimum, the Suspension Clause protects the writ 'as it
existed in 1789,'" id. at 1788 (quoting Felker).  And the Court
went on to observe:

> The fact that this Court would be required to answer
> the difficult question of what the Suspension Clause
> protects is in and of itself a reason to avoid
> answering the constitutional questions that would be
> raised by concluding that review was barred entirely.
> Cf. Neuman, Habeas Corpus, Executive Detention, and the
> Removal of Aliens, 98 Colum. L.Rev. 961, 980 (1998)
> (noting that "reconstructing habeas corpus law . . .
> [for purposes of a Suspension Clause analysis] would be
> a difficult enterprise, given fragmentary
> documentation, state-by-state disuniformity, and
> uncertainty about how state practices should be
> transferred to new national institutions").[8]

Id. at n.13.  Whether the Suspension Clause protects only the
"writ antecedent to statute," Williams v. Kaiser, 323 U.S. 471,
484 (1945), or "the writ as it exists today," Felker, 518 U.S. at
663, its protection is absolute in the absence of "invasion" or
"rebellion."  Neither rebellion nor invasion was occurring at the
time the MCA was enacted.  Indeed, Congress itself must not have

---

[8]In both Felker and St. Cyr, the Court was quick to point
out that neither the AEDPA nor the IIRIRA purported to repeal its
own original jurisdiction of habeas cases, which was expressly
granted by the Judiciary Act of 1789, Felker, 518 U.S. at 660-61,
quoted in St. Cyr, 533 U.S. at 298-99.  The jurisdiction-
stripping language of the MCA, of course, does purport to repeal
the habeas jurisdiction of Supreme Court justices("No court,
justice or judge . . . ." MCA § 7(a)).

- 14 -

thought that it was "suspending" the writ with the enactment of the MCA, since it made no findings of the predicate conditions, as it did when it approved Lincoln's suspension in the Civil War and each of the subsequent suspensions in Mississippi, the Phillippines, and Hawaii.  Thus, the Great Writ has survived the Military Commissions Act.  If and to the extent that the MCA operates to make the writ unavailable to a person who is constitutionally entitled to it, it must be unconstitutional.

**3.  Hamdan is not entitled to the constitutional writ that survives the MCA.**

The jurisdiction of federal courts over the habeas petitions of detainees at Guantanamo Bay rested upon the grant of jurisdiction in the habeas statute and upon the United States' exercise of "complete jurisdiction and control" over the Navy base in Cuba.  Rasul, 542 U.S. 466, 471, 481 (2004).  Because the habeas statute drew no distinction between citizens and aliens, moreover, the Court found "little reason to think that Congress intended the geographical coverage of the statute to vary depending on the detainee's citizenship.  Aliens held at the base, no less than American citizens, are entitled to invoke the federal courts' authority under § 2241."  Id. at 481.  My original assumption of jurisdiction of Hamdan's habeas petition depended entirely upon Rasul and upon § 2241, 344 F. Supp. 2d at 156.  Now that the MCA has amended § 2241 so that it no longer serves as the basis for my jurisdiction, I must inquire whether

- 15 -

Hamdan or any other alien is constitutionally entitled to the writ.

It has long been the practice of judges to ascertain the "meaning of the term habeas corpus [by reference to] the common law." Ex parte Bollman, 8 U.S. at 93-94 (1807). Petitioner cites at least two English common law cases in which "aliens detained by the Executive at wartime" brought habeas petitions challenging their designation as enemies. [78 at 20], citing Case of the Three Spanish Sailors, 96 Eng. Rep. 775, 776 (C.P. 1779); Rex v. Schiever, 97 Eng. Rep. 551 (K. B. 1759). In dicta, the majority in Rasul cited several other examples of pre-1789 habeas petitions brought by aliens detained within the sovereign territory or elsewhere within the sovereign's control. Rasul, 542 U.S. at 481 n.11.[9] Unfortunately, those cases do not so easily resolve the issue when the statutory grant of habeas has been withdrawn. In each of them, habeas relief was either (1) denied, in an opinion that failed to distinguish between

---

[9]The court supplied the following list of English and American habeas proceedings prior to 1789 and shortly thereafter: King v Schiever, 2 Burr. 765, 97 Eng. Rep. 551 (K. B. 1759); Sommersett v Stewart, 20 How. St. Tr. 1, 79-82 (K. B. 1772); Case of the Hottentot Venus, 13 East 195, 104 Eng. Rep. 344 (K. B. 1810)); United States v. Villato, 2 Dall. 370, 2 U.S. 370, 1 L. Ed. 419 (CC Pa. 1797); Ex parte D'Olivera, 7 F. Cas. 853, F. Cas. No. 3967 (CC Mass 1813) (Story, J., on circuit); Wilson v. Izard, 30 F. Cas. 131, F. Cas. No. 17810 (CC NY 1815) (Livingston, J., on circuit).

- 16 -

jurisdictional and substantive grounds for the dismissal;[10] (2)
denied to a prisoner of war without connections to the country in
which the writ was sought;[11] or (3) granted to an alien with a
significant relationship to the country in which the writ was
sought.[12]  Not one of the cases mentioned in <u>Rasul</u> held that an
alien captured abroad and detained outside the United States – or
in "territory over which the United States exercises exclusive
jurisdiction and control," <u>Rasul</u>, 542 U.S. at 475 – had a common
law or constitutionally protected right to the writ of habeas
corpus.[13]

---

[10]<u>See, e.g.</u>, <u>Case of the Three Spanish Sailors</u>, 96 Eng. Rep.
775, 776 (C.P. 1779); <u>Rex v. Shiever</u>, 97 Eng. Rep. 551 (K. B.
1759).  Note, too, that petitioners in both of these cases were
held within English sovereign territory, unlike petitioner
Hamdan.

[11]<u>Rex v. Schiever</u> falls under this category as well:
"[petitioner] is the King's prisoner of war, and we have nothing
to do in that case, nor can we grant an habeas corpus to remove
prisoners of war."  96 Eng. Rep. 1249 (K. B. 1759).

[12]<u>See, e.g.</u>, <u>U.S. v. Villato</u>, 2 U.S. 370, 28 F. Cas. 377, 1
L. Ed. 419 (No. 16,622) (Pa. 1797) (petitioner, though Spanish-
born, had traveled from New Orleans to Philadelphia and attempted
to become a citizen before the offense that precipitated his
detention).

[13]Note that even <u>INS v. St Cyr</u>, heavily relied upon by
petitioner Hamdan and filled with language extolling the
importance of habeas corpus in challenging executive detention,
contains this limited description of the rights herein asserted:
"[i]n England prior to 1789, in the Colonies, and in this Nation
during the formative years of our Government, the writ of habeas
corpus was available to <u>nonenemy aliens</u> as well as to citizens,"
533 U.S. at 301.

The petitioner in <u>Sommersett v. Stewart</u> was not an
enemy alien but a slave challenging his enslavement.  Unlike
Hamdan, James Sommersett was temporarily residing in England, and
the asserted unlawfulness of his confinement stemmed from the
arguable illegality of slavery in England.  98 Eng. Rep. 499 (K.
B. 1772).  In the <u>Case of the Hottentot Venus</u>, Saartje Baartman –
a South African exhibited in a cage in Piccadilly, England – was
a non-enemy foreigner from the British Protectorate of South
Africa who could invoke the protection of the Crown by right.
104 Eng. Rep. 344 (K. B. 1810).

In American habeas actions, alien petitioners have had
access to the writ largely because they resided, lawfully or
unlawfully, on American soil.  <u>See, e.g.</u>, <u>The Japanese Immigrant
Case</u>, 189 U.S. 86, 101 (1903) (alien, while alleged to have
entered the country unlawfully, nevertheless had made himself "a
part of its population"); <u>Yick Wo v. Hopkins</u>, 118 U.S. 356 (1886)
(petitioner had been a legal resident of the United States for
over twenty years).  Hamdan has been a prisoner of the United
States for five years.  He has lived nearly all of that time
within the plenary and exclusive jurisdiction of the United
States, but he has not become a part of the population enough to
separate himself from the common law tradition generally barring
non-resident enemy aliens from accessing courts in wartime.  <u>See
Ex parte Kawato</u>, 317 U.S. 69, 72-75 (1942) (describing common law

- 18 -

rule).  His detention in Guantanamo, in other words, has not meaningfully "increase[d] his identity with our society." Eisentrager v. Johnson, 339 U.S. 763, 770 (1950).

It is the Eisentrager case that appears to provide the controlling authority on the availability of constitutional habeas to enemy aliens.[14]  In that case, petitioners were Germans living in China in the aftermath of World War II.  Id. at 765. After trial before a United States Military Commission in China, they were convicted of war crimes and sent to occupied Germany to serve their sentences.  Id. at 766.  The Supreme Court held that they had no constitutional entitlement to habeas relief in U.S. Courts because "at no relevant time were [they] within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial, and their punishment were all beyond the territorial jurisdiction of any court of the United States."  Id. at 778.

Hamdan contends that several of the differences between the Guantanamo petitioners and the Eisentrager petitioners are constitutionally significant.  First, he notes that the Eisentrager petitioners admitted that they were enemy aliens, whereas petitioner Hamdan has always objected to his

_____

[14] Eisentrager was unimportant to the statutory habeas question presented the last time Hamdan was here, as the Supreme Court had made plain in Rasul, 542 U.S. at 475-76, and was not dispositive on the questions presented in the earlier Hamdan case, 126 S.Ct. at 2794.

classification as an unlawful enemy combatant [78 at 25].  Here,
however, as in Eisentrager (where petitioners amended their
petitions to assert that they had really been civilian employees)
Hamdan's "exact affiliation is . . . for our purposes,
immaterial."  Eisentrager, 339 U.S. at 765.  Second, Hamdan
claims that, unlike the Eisentrager petitioners, he has never
been afforded access to a proper tribunal.  That observation is
obviously true, thus far, but Hamdan is to face a military
commission newly designed, because of his efforts, by a Congress
that finally stepped up to its responsibility, acting according
to guidelines laid down by the Supreme Court.  It is difficult to
see how continued habeas jurisdiction could make further
improvements in his tribunal.  Third, Hamdan argues that, after
several years in a territory within "the complete jurisdiction
and control" of the United States, his relationship with the
United States is more extensive than those of petitioners in
Eisentrager.  See Rasul, 542 U.S. at 480.  This third distinction
merits further consideration.

        Hamdan's lengthy detention beyond American borders but
within the jurisdictional authority of the United States is
historically unique.  Nevertheless, as the government argues in
its reply brief, his connection to the United States lacks the
geographical and volitional predicates necessary to claim a
constitutional right to habeas corpus [85-1 at 15].  Petitioner

has never entered the United States and accordingly does not
enjoy the "implied protection" that accompanies presence on
American soil.  <u>Eisentrager</u>, 339 U.S. at 777-79.  Guantanamo Bay,
although under the control of the United States military, remains
under "the ultimate sovereignty of the Republic of Cuba."  <u>Rasul</u>,
U.S. 542 at 471.  Presence within the exclusive jurisdiction and
control of the United States was enough for the Court to conclude
in <u>Rasul</u> that the broad scope of the habeas <u>statute</u> covered
Guantanamo Bay detainees, but the detention facility lies outside
the sovereign realm, and only U.S. citizens in such locations may
claim entitlement to a <u>constitutionally</u> guaranteed writ.  <u>United</u>
<u>States v. Curtiss-Wright Export Corp.</u>, 299 U.S. 304, 318 (1936).
There is no dispute, moreover, that Hamdan's presence within the
exclusive jurisdiction of the United States has been involuntary.
Presence within the United States that is "lawful but involuntary
[ ] is not of the sort to indicate any substantial connection
with our country" that would justify the invocation of a
constitutional right to habeas corpus, <u>United States v.</u>
<u>Verdugo-Urquidez</u>, 494 U.S. 259, 271 (1990).[15]

---

[15]My ruling does not address whether and to what extent
enemy aliens may invoke other constitutional rights; I find only
that the Suspension Clause does not guarantee the right to
petition for habeas corpus to non-resident enemy aliens captured
and detained outside the United States.

**Conclusion**

Congress's removal of jurisdiction from the federal courts was not a suspension of habeas corpus within the meaning of the Suspension Clause (or, to the extent that it was, it was plainly unconstitutional, in the absence of rebellion or invasion), but Hamdan's statutory access to the writ is blocked by the jurisdiction-stripping language of the Military Commissions Act, and he has no constitutional entitlement to habeas corpus.[16]  Hamdan's habeas petition must accordingly be dismissed for want of subject matter jurisdiction.

JAMES ROBERTSON
United States District Judge

---

[16] Having been divested of jurisdiction over Hamdan's habeas petition, I do not reach his other arguments that the MCA is unconstitutional – because it does not provide an adequate substitute for habeas review, because it violates the principle of separation of powers by instructing the courts to ignore the Supreme Court's ruling that the Geneva Conventions afford judicially enforceable protections to petitioner Hamdan, because it is an unlawful Bill of Attainder, and because it violates Equal Protection.

- 22 -